Next case for argument is 151962 Andrulis Pharmaceuticals v. Celgene Corporation Good morning. May I please have the floor? This is a case involving combination chemotherapy, specifically a combination chemotherapy applying the ingredients of thalidomide and alkylating agents. The parties have a few claim construction disputes that are addressed in the briefing today. I'd like to focus on one of those terms as the enhanced term, which the district court found indefinite and thereby dispositive. Obviously, I'm happy to answer questions on any of the terms, but I'll focus my limited time today. And your construction of enhanced is? Greater than additive. And that is based on? That's an excellent question, on the intrinsic record. The term enhanced was introduced in the prosecution history in response to a 103 rejection. The examiner found that the claim combination would be obvious over a certain piece of prior art, the liversidge patent, if it claimed only a combination of additive effect. Now the liversidge patent is directed to an invention for a means of delivery of chemotherapy where the specification discloses a large menu of chemotherapeutic agents, which the specification indicates may be administered alone or in combination. Therefore, the patent examiner said that a skilled artisan would be motivated to combine those elements, including the claimed elements in this patent, for their mere additive effect, but that if the patent owner could show a combination directed to The patentee, Andrew Ellis, responded by amending the claims to add the term enhanced. The patentee vigorously disagreed with the assertion that liversidge disclosed a combination showing the type of enhancement demonstrated by the claimed combination, and the patentee added. I thought the vigorous disagreement was more about whether the reference actually taught or suggested a combination of thalidomide with one of these other anti-cancer agents. Well, I think those two points go together. I think the point is, I believe the record shows that the examiner pointed to liversidge to show that any number of these chemotherapeutic agents could be combined. As the patentee argued, however, liversidge did not focus on the specific claimed combination, which distinguishes itself by having, we argue, greater than additive effect relative to the other combinations disclosed in liversidge. Where in your remarks section, in your response to the office action, did the applicant actually say, we have a greater than additive effect here? The applicant attached an exhibit A that contains a series of materials that reflect the available science at that time. In particular, I would call the court's attention to the first and last documents in that exhibit. In your view, do any of those articles actually teach or suggest that there's a greater than additive effect when you're combining these ingredients together? Because I didn't quite see that. I didn't see them say, there's something synergistic. One plus one equals three. Right. The articles do not claim that one plus one equals three in this case. That is true. What they do disclose is that, for instance, in the USA Today article, that the claim combination, or in that case, the combination of thalidomide and carboplatin increased patient's lifespan, remaining lifespan from 11 to 40 weeks, an increase of 363%. The patentee pointed to this as evidence satisfying the examiner's rejection. Even that article, however, notes that further clinical trials would be required to prove the effectiveness of the combination. That is consistent with the patentee's position in this case. Did the inventors do any of their own research and generate some results on their own? They worked in collaboration with, among other researchers, NYU. That's precisely what the first document in exhibit A to the amendment is. However, they themselves did not conduct or complete clinical trials. No. I would submit that patent law does not require the inventor to prove an invention. In accord with that, no. The patentee did not have the funds or the resources to conduct clinical trials and did not complete those. I guess I was wondering, how did the inventors come up with the invention? Was it based on reading medical journals or something like that? Dr. Peter Andrewlis, the CEO of Andrewlis Pharmaceuticals, had been involved in research regarding thalidomide for quite a long time. He's been published in other fields regarding advances in thalidomide. A background point that's important to note here is that at the time of the invention, thalidomide was still in its early stages recovering as a drug being reintroduced to the scientific community. That is the context in which the invention was created. Dr. Andrewlis had researched many uses of thalidomide and this was one of them. But to answer your original question, no. Clinical trials were not completed. If we conclude, based on a review of the prosecution history, that there really isn't a fair way of reading enhanced to map on the examiner's statement of greater than additive, then where are we? Do we then arrive at a point where we cannot conclude that enhanced means greater than additive? And then therefore, because that was the grounds for indefiniteness, we should affirm? I don't think so. This is a good moment to address the district court's opinion. The district court, as the board knows, found that enhanced can mean additive, greater than additive, or less than additive, essentially any degree of enhancement. I would submit that there is no support in the record for a finding that enhanced in this patent means less than additive. And that is the point that we for what it omits. It omits the clear and convincing standard of evidence and it also omits any reference to supporting testimony on the perspective of a person of ordinary skill in the art. In this case, the district court expressly stated that it was not relying on cell genes expert and nonetheless found that enhanced could mean any degree of enhancement, thus adopting the opinion of cell genes expert. However, to be clear, less than additive combination would have to mean that the components of the combination actually inhibit each other's effectiveness. That is, if you take one and one, each component is decreased to some value less than one. It's strange credulity, I would submit. Is it possible that they have overlapping impacts to a certain degree such that you don't get necessarily a one plus one equals two but because they both somehow are operating on the same item or mechanism or something like that, then therefore you end up with something a little bit less than additive? Yes, in the abstract that is possible. I don't believe that's what this patent claims. Both the specification states and the inventor testified that the invention is directed to combinations of agents that have different mechanisms of action and combine in a way that as the prosecution history shows, have an effect that is greater than the generically disclosed additive combinations of liversidge. So yes, we come back to the liversidge patent. But to find that the patent claims a less than additive combination would be to find that there was no invention at all. In other words, it would be contrary, it would be difficult to read in light of the record that the patentee intended to cite exhibit A showing the results that blew away the investigators at NYU, that those results were claiming a less than additive combination, that our invention is something that diminishes the effectiveness of each of the components. That would not be consistent with anything in the record. Is that what less than additive means? Because I was under the impression it would mean that the combination of the ingredients gives you, it yields some kind of benefit above and beyond using any of the ingredients alone. Well, it would mean that... And so therefore, you would have some kind of plus advantage in using the combination rather than any of the ingredients alone. Right. I don't think that the parties are in disagreement regarding the definition of less than additive. That is, a less than additive combination would be one plus one equals 1.5. So in other words, the components, each component would be diminished, but the net effect would be greater than a single component. That is correct. I'd like to note before I move on quickly here that Solgin's argument that enhances a indefinite term of varying degree does not, or excuse me, it is not consistent entirely with this course prior jurisprudence. We know from biosig that terms of degree are not inherently indefinite. And I would further note that Halliburton, the case that Solgin cites throughout the briefing in fact states that a person of ordinary skill in the art is likely to conclude that the definition of a term does not encompass that which is expressly distinguished as prior art. This case somewhat uniquely presents an instance where the patentee and the patent examiner expressly address that situation in the prosecution history where they distinguish prior art and narrowing the claims by amending them and adding the term enhanced. And thus I submit that the term should be read consistent with that prosecution history. You're into your rebuttals. Let's hear from the other side. May it please the court. There is no special definition of enhanced in this intrinsic record. Andrew was conceded moreover. What's wrong with just thinking of the word enhanced as improved? Some benefit, some benefit above and beyond any of the ingredients by itself. There's nothing wrong. Would that be an indefinite usage of the word enhanced in a claim? Yes. Yes, it would. And there's nothing wrong with, I think the district court viewed the term. Terms of degree like that are in claims all the time. There's several problems with this particular one. And so in other words, the notion here is this combination is better. It's better. And what does that mean? We don't know. They argued that the results they got in exhibit A in their amendment were not achieved by the prior art, but nobody knows what level of enhancement, what level of better those results are. You have to claim with specificity the utility you get from any kind of combination patent. I mean, all combination patents have some utility. And now we're asking patent drafters to be very specific in how it claims the utility. Your Honor, I don't think you have to claim utility. Of course, you do have to have utility, but this is not a utility issue that we have here. They wrote enhanced into the claim. And so the meets and bounds of what that enhanced combination is has to be known with reasonable certainty by persons of skill in the art. These claims don't have a reasonably certain scope. They do not provide the notice function the claims have to provide as to what's in and what's out. Nobody, a competitor, wanting to stay away from these claims, wanting to not fringe, has no means by which they can do that with any reasonable certainty and know I'm in or I'm out when I do something. So, for example... I would just read the claim as any therapeutically effective amount of the two recited ingredients in combination would meet the claim. That claim was rejected. And so what they put into the claim was an enhanced therapeutically effective amount, not merely an effective amount. So enhanced was added to specify an amount, but it is an indefinite amount. And it's an indefinite level of enhancement or the combination. What if... There's no question that under these claims, you can use an unenhanced combination. If you're an unenhanced combination, you do not infringe these claims. They put in a level of enhancement that has to be achieved, an indefinite level of enhancement that has to be achieved into the claim. If they had simply said, let me put this in perspective of a situation one often finds in pharmaceutical cases, whether it's a combination claim or not. When there's an obviousness debate about whether a given drug, it could be a combination, is effective or is non-obvious or not, sometimes a patentee will put in evidence of, for example, synergy to try to establish non-obviousness. They'll put it in as a secondary consideration. And the examiner may find, in view of the synergy showing as a secondary consideration, that the claim is allowable. And they will allow the claim as an effective amount of A in combination with an effective amount of B. And in that situation, we know that the patent specifies effective amounts for A, effective amounts for B. You know whether you're practicing the method or not when you use 50 mg of A, 50 mg of B. You're treating disease C. And so you know you're within the scope of the claim. And the showing of synergy in that instance was used to get the claim allowed to establish non-obviousness. That is not what we have here. They wrote a level of enhancement into the claim. So you have to practice this invention, one has to achieve some level of enhancement. And the problem we have is we don't know what level of enhancement that is. That's the problem. Maybe what we have here is a narrower question in that all that the district court was confronted with was the specific question of whether this word enhanced necessarily means greater than additive. And if it doesn't necessarily mean greater than additive, then all the parties agreed that the claim would be indefinite. And that is correct. On that narrow question that the district court said what it said, and that's what we have to review. Your Honor, that is the situation that we have. That is absolutely the case. And Your Honor asked a question of my opponent as to what is less than additive. And there was a discussion about what less than additive is. I think that would be useful to discuss right now in this context. If I have drug A that has a cure rate of 20% and drug B has a cure rate of 20%, and then when I combine the two, I get a cure rate of 35%. That's a nice improvement. It's increased, which is what Your Honor indicated as a possible definition of an enhanced. And I think that, Your Honor, actually is what the trial judge regarded as the general meaning of enhanced. Clearly, this less than additive combination is improved. It's increased. And on page 29 of Andrew Ellis's opening brief, they even say that an alternative definition that they would accept is consistent with the intrinsic record. This is stated on page 29 of the brief, is a better outcome with the combination than with either drug used alone. So in my hypothetical, the combo that achieves a 35% cure rate is clearly a better outcome than either drug alone. It is fully within this broad notion of enhanced, of a better outcome as described, even in their own alternative definition. They conceded that this claim, when extended to these less than additive effects, which are certainly not excluded by the claim, is indefinite. And that's, Judge Andrews relied on that representation, relied on that concession that they made to him. And I think the situation we have is exactly as Your Honor described. And to elaborate, I guess, a little further on this, there was a mention of this USA Today article, which has become kind of the foundation, really, of their arguments that this claim does not extend to less than additive effects. And this argument wasn't made to the district court. It's made for the first time in their brief on appeal here. But they said, we know that what, I think it was Dr. Gruber in the USA Today article, when he said, we know when he said he was blown away by the results, that it can't be less than additive, because you wouldn't be blown away by a less than additive effect. Well, that's sheer speculation. That's just attorney argument. Personally, as a patient, and perhaps as a doctor, in my hypothetical, when you get a 35% cure rate instead of a 20, as a patient, I would like that much better. And I like my odds better. And I would be perhaps blown away by that. Does that mean that it's no longer less than additive, just because I'm blown away by it? And I'm thinking of this court's statement in interval licensing, where it said that a claim is indefinite if you leave the skilled artisan to consult the unpredictable vagaries of any one person's opinion. And that's what we have here. We have the patentee consulting the vagaries of Dr. Gruber's opinion as reported in a USA Today article. No data. No data to tell us whether that is greater than additive, additive, or less than additive. It's actually even more opaque than that, in that in that very article, in the same page that Dr. Gruber's blown away statement occurs, on the left-hand column, there's reports from Dr. Fine, of his studies on using thalidomide alone in the same cancer. And he had a patient who survived for 18 months after treatment with thalidomide alone. So that's 72 weeks, as opposed to the 40 weeks median that Dr. Gruber had. So is Dr. Gruber talking about something that is additive, less than additive? I mean, it's a complete mystery. Judge Andrews was entitled properly to rely on the concession that Andrews made before the district court. He interpreted the claims correctly, consistent with the intrinsic record. They did not make any statements indicating when they made their amendment that enhanced somehow meant synergy or greater than additive. In fact, if they had thought that that's what it meant, they almost certainly would have said, this mooted the 103 rejection that the examiner made, rather than argue that they had vigorous disagreement with the examiner. Your honor, your honors, I think that those are the critical points that I would like to make. If the court has any questions, I've got time remaining, but I would happily surrender it to the court. I'd like to make just a couple of quick points. One, a point of correction. Andrews did not concede before the district court that if enhanced does not mean greater than additive, that is indefinite. Andrews did concede that if it means any degree of enhancement, therefore less than additive, additive, or greater than additive, then it is indefinite. And that's a significant point as outlined in our opening brief. I'd like to touch on one other point very quickly in my one and a half minutes here. You heard my colleague, Mr. Griffith, talk a bit about how to read these claims as a patient, as a doctor. And I think that calls to mind the problem that we have here, that we do not have the perspective of a person of ordinary skill in the art in the record before the district court. And that was an omission that I submit was reversible error by the district court. Candidly, I'm a chemotherapy patient myself, and I submit that if the court were to consult a medical oncologist and ask them what is the objective of combination chemotherapy, it would not be long before the word synergy comes up. This is a term that has common usage in the field of medical oncology and is one that medical oncologists, persons of ordinary skill in the art, would understand. By analogy, this court has held before that a person of ordinary skill in the art in the pharmaceutical context would understand the meaning of effective amounts, that regardless of the fact that effective could mean any number of things in the abstract, yet still a person of ordinary skill in the art, a medical oncologist, would understand what an effective amount of a drug is. They would understand the concept of effectiveness, and likewise, they would understand the concept of synergy in this case. If the court has any other questions, I'm happy to answer them. Thank you. We thank both counsel, and the case is submitted.